UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

RENEE WELCH, JASON DEMELLO,
MAMADOU DEMBELE, SOULEYMANE
MORI, DOLUNAY MOSER, and MINERVA
ELSAYED,

        Plaintiffs

v.

PEOPLE'S UNITED BANK, NATIONAL
ASSOCIATION,

        Defendant

## **COMPLAINT**

## I.   **INTRODUCTION**

1.     This action arises out of a pattern of discrimination by the defendant, People's United Bank, National Association ("PUB"), directed against the plaintiffs, Renee Welch ("Welch"), Jason DeMello ("DeMello"), Mamadou Dembele ("Dembele"), Souleymane Mori ("Mori"), Dolunay Moser ("Moser") and Minerva Elsayed ("Elsayed") (collectively, the "Plaintiffs"). As set forth in detail below, each of the plaintiffs were employees of PUB and worked in Massachusetts branches of the bank.

2.     PUB established, tolerated and fostered an atmosphere of discrimination against these employees and others sounding in racial discrimination, sexual orientation discrimination, gender discrimination, religious discrimination and ethnic origin discrimination as set forth below. Further, PUB failed to establish an effective and meaningful system for employees to complain of such discrimination and to have it rectified, and retaliated against employees who did complain. The discrimination was perpetrated by several members of senior-level

1

management at PUB including Patrick J. Sullivan ("Sullivan") the president of PUB in Massachusetts, and Anna Greener ("Greener"), the retail director of Massachusetts and the senior vice president for growth in Massachusetts. The discriminatory actions set forth below were not isolated incidents but instead were commonplace at PUB, which resulted in a toxic workplace culture and a hostile work environment. Plaintiffs bring claims for violation of Title VII of the Civil Rights Act of 1964 and M.G.L. c. 151B (Count I), violation of Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 *et seq.* and M.G.L. c. 151B (Count II), violation of the Age Discrimination in Employment Act, 29 U.S.C. § 623(A) and M.G.L. c. 151B (Count III), and wrongful termination in violation of public policy (Count IV).

**II.    PARTIES**

3.      Plaintiff Welch is a natural person with a last and usual residence at 55 Montebello Road, Boston, Massachusetts.

4.      Plaintiff DeMello is a natural person with a last and usual residence at 13933 Miranese Street, Venice, Florida.

5.      Plaintiff Dembele is a natural person with a last and usual residence at 70 Constitution Avenue Apartment 316, Portsmouth, New Hampshire.

6.      Plaintiff Mori is a natural person with a last and usual residence at 95 West Clark Street, Apartment 23, Manchester, New Hampshire.

7.      Plaintiff Moser is a natural person with a last and usual residence at 38 Village Road, Middleton, Massachusetts.

8.      Plaintiff Elsayed is a natural person with a last and usual residence at 30 Parkside Place, Unit 509, Malden, Massachusetts.

9.      The Defendant, PUB, is a foreign corporation with a principle place of business

located at 850 Main Street, Bridgeport, Fairfield County, Connecticut. PUB is a subsidiary of People's United Financial, Inc., which is a financial services company with approximately $59 billion in assets. PUB has over 400 retail locations and more than 5,500 employees offering commercial and retail banking and wealth management services throughout Massachusetts and other states.

## III.   JURISDICTION

10.     This Court has jurisdiction over the subject matter and the defendant in this case pursuant to 28 U.S.C. §1331 (federal question jurisdiction). This Court has supplemental jurisdiction over the state law claims because such claims are integrally and factually related to the federal claims and form part of the same case or controversy pursuant to 28 U.S.C. §1367.

## IV.   FACTS

### A.   Renee Welch

11.     In or about December, 2016, Welch, who is African-American, was hired by DeMello to manage the newly-opened Copley Square branch of PUB.

12.     Welch was well qualified, as she had substantial experience in managing branches of other banks in Needham, Wellesley, Westwood and Downtown Boston, Massachusetts.

13.     Her salary at PUB was approximately $100,000 per year plus incentives and benefits.

14.     At the beginning of her employment at PUB, Welch reported to DeMello and Matthew Wildman ("Wildman"), and enjoyed a positive working environment.

15.     In or about April of 2017, Greener was hired as a Senior Vice President and Senior Growth Manager of PUB.

16.     Greener and Dominick Doyle ("Doyle") became Welch's supervisors.

3

17.     Immediately, the working environment for Welch deteriorated. Greener complained about the way Welch braided her hair and said she "dresses like a hood girl".

18.     Greener would routinely mock Welch and imitate her by adopting an exaggerated and stereotypically "black" accent.

19.     Greener was critical that Welch was hired for the Copley branch, complaining that Welch "dresses ghetto" and Copley "is an affluent gay market". Greener said Welch should not be running PUB's Copley branch and that a gay person would be better suited in that position.

20.     Greener told DeMello that Welch "doesn't fit the profile of Copley" and that he "overpaid" for Welch because she would have accepted less in salary.

21.     Greener asked DeMello to reassign Welch because of her race and to find a gay manager for the Copley branch. DeMello refused.

22.     Greener and Doyle began to demean Welch in front of customers and other PUB employees, and they would discipline Welch for purported infractions that were otherwise ignored when done by her Caucasian counterparts.

23.     Greener said that Welch reminded her of a sassy female black character from the movie "Jumping the Broom." Greener affected that character's southern accent in imitating Welch, stating, "I'm black!"

24.     On one occasion, Doyle confronted Welch and said: "I want you to go buy a broom and I want to see you outside sweeping the front sidewalk. I don't want to see you delegate this to anyone else. I want to see you personally outside doing this." Welch replied to Doyle: "Don't talk to me like I am a slave."

25.     Welch was very upset by this encounter, and called Caucasian branch managers

of other PUB branches to ask if they had ever been told to buy cleaning supplies and clean the branches personally. They replied that they had not. Welch reported this to Human Resources, and was merely told that Doyle was only joking and not to take him too seriously. They told Welch that she did not have to buy a broom and sweep the store herself.

26.     Despite this harassing treatment, Welch was successful at her work. Upon information and belief, she met or exceeded her projected goals. Based on these performance metrics, there was no legitimate, non-discriminatory reason why Welch should have been transferred to any other branch.

27.     To cause further distress to Welch and to cause her to want to leave, Greener unilaterally changed the terms of Welch's compensation plan resulting in Welch being denied money that had previously been promised to her. Greener significantly increased Welch's financial performance benchmarks which were not commensurate with the reasonable expectations of how much new business the Copley branch was expected to generate.

28.     In addition, Greener repeatedly denied requests by Welch to increase her profile and visibility within the Copley market. Welch repeatedly asked Greener for opportunities to engage in reasonable marketing efforts.

29.     It is well-established in the Massachusetts retail and commercial banking industry that managers are financially compensated and rewarded in part by the number and size of loans they originate and get funded. Managers are incentivized to generate business and to present commercially-reasonable loan packages to senior management and underwriting. Welch, and each plaintiff, were financially incentivized to close more loans.

30.     Despite this, Greener would routinely refuse to approve reasonable business deals brought to her by Welch, even for potential loan clients who would have brought in substantial

revenues to the bank. Greener repeatedly refused to accommodate Welch's reasonable requests. This hurt Welch financially and career-wise.

31.     In order to make Welch look less successful and to negatively skew her productivity, Greener moved money out of the Copley Square branch and temporarily transferred or "parked" it at another branch. This hurt Welch reputationally, as it made it appear as if she had not been as successful as in fact she had been. It also negatively affected Welch's performance-based bonuses.

32.     PUB senior-level managers and Human Resources personnel would routinely conduct so-called "nine-box" meetings, where they would discuss assignments of branch managers. These meetings were held approximately once per quarter, and each lower level branch manager's name was written on post-it notes as their reassignments were discussed. Reassignments at nine-box meetings are intended only to be based on a manager's merit and performance.

33.     At the PUB nine-box meetings, it was a routine practice for Greener and Anthony Ferraro ("Ferraro"), who was a senior-level Human Resources representative for PUB, to discuss the reassignment of branch managers due to their race or ethnicity, regardless of whether the employee wanted to be relocated.

34.     During one nine-box meeting, Greener announced that she wanted to move Welch out of Copley Square, as she was "ghetto" and does not fit the "Copley Square profile". Greener said: "A black woman should not be managing Copley," and that Welch "would be a better fit in Chelsea." Greener also said that she wanted to move a certain branch manager, Ms. "A", who was of Middle-Eastern descent, into a more "ethnic" neighborhood branch. Ferraro agreed with Greener and with her given reasons for wanting to make those reassignments.

6

35.     Thus, on Greener's initiative and with the approval of Sullivan and Ferraro, in or about January, 2018 Welch was transferred from the Copley branch to the less desirable Chelsea branch where she remains today. This reassignment was done on the basis of racial discriminatory animus, the unfair manipulation of performance-based incentives, and the cooperation and knowing complicity of senior management at PUB.

36.     After Welch was transferred, Greener said that she had "got rid of the trash in Copley".

37.     After Welch was transferred to Chelsea, Greener appointed a male Caucasian manager to the Copley Square branch.  Greener then moved the money back to the Copley branch that she had removed when Welch was the manager.

38.     Greener is still in a supervisory capacity over Welch and has retaliated against her for complaining about her treatment and bringing claims against PUB. Prior to Greener's involvement, Welch was considered an excellent employee and received positive performance evaluations. Yet, after Welch complained, Greener deemed Welch to be a less-than-excellent employee.

39.     Upon information and belief, Greener has made it particularly difficult for Welch to close new business loans. Greener imposed, on an ad hoc basis, more stringent underwriting requirements for Welch's loan packages than similarly situated Caucasian branch managers. Either directly or indirectly, Greener has prevented Welch from contracting with potentially profitable PUB clients. This hurt Welch financially, who is compensated in part by her loan production numbers as set forth above.

40.     Greener has refused to provide Welch raises and bonuses commensurate with Welch's Caucasian colleagues. If Welch had still been at Copley where she was hired for, most

likely she would have been bringing in larger deal flow and been making more in annual salary and bonuses than she is now.

41.     In October, 2019, Welch had a nervous breakdown as a result of the discriminatory treatment and harassment. She lost some of her hair, she lost some of her eyesight, and she took a leave of absence under medical supervision.

42.     Welch filed an action at the Massachusetts Commission Against Discrimination ("MCAD") alleging violations of G.L. c. 151B, § 4, and Title VII of the Civil Rights Act of 1964. See MCAD Docket No.: 17BEM03182.

43.     On or about August 26, 2019, MCAD determined that Welch's charge of discrimination against PUB lacked probable cause, however this determination was made strictly on procedural grounds and was not based on the merits of Welch's charge of discrimination. Unbeknownst to Welch, her prior counsel had failed to timely respond to MCAD's requests for information and, as a result, MCAD ruled that Welch "ha(d) not responded" to MCAD's "attempts to amplify or clarify her allegations or to amend her complaint" and "attempts to contact (Welch's) witnesses were unsuccessful."

44.     On or about November 12, 2019, a Preliminary Hearing was held regarding Welch's appeal of MCAD's determination. Since that time, MCAD has not issued a ruling on Welch's appeal.

45.     On or about July 22, 2020, withdrew her appeal from MCAD and removed her action pursuant to 804 CMR 1.15(2). On or about June 4, 2020, Welch removed her action from the Equal Employment Opportunity Commission ("EEOC") and now brings this action.

46.     Welch has been victimized by PUB because she is African-American. Greener resented her presence as a manager in the Copley market, made numerous racist tropes against

her and about her, increased her financial benchmarks and incentives unreasonably high in order to cause her to fail, and unjustifiably manipulated the assets in her branch so as to hurt her production numbers. The management of PUB was well aware of this discriminatory treatment, as Greener was explicit about her animus in the presence of Sullivan and Ferraro and Sullivan and Ferraro approved of it.

### B.  Jason DeMello

47.     DeMello is a senior-level banking executive with nearly twenty years' experience in the financial industry.

48.     In or about April, 2016, DeMello was recruited to work at PUB and was hired as a vice president and senior marketing manager in the Boston market. His salary was approximately $120,000 per year plus incentives.

49.     DeMello is gay. As part of his civic involvement while working for PUB, DeMello was also the president of the Greater Boston Business Council, whose mission is to foster and promote the vitality and productivity of the LGBT business community in the Greater Boston area.

50.     Sullivan was aware that another Vice President of PUB, Mr. "B", was also gay. In the presence of DeMello, Sullivan criticized that vice president's performance, saying, "AIDS is making [him] lumpy". That employee was then demoted by Sullivan.

51.     When DeMello and Mr. "C", another openly gay employee of PUB, arrived at a meeting of PUB executives and senior-level Human Resources representatives, Vice President Paul Kelly stated: "I'm so glad the pansies could make it to the meeting." Sullivan assented to this harassment through his silence and his failure to make clear that such harassing conduct would not be tolerated.

52.     DeMello brought two openly gay clients to meet with a senior broker at PUB. The broker refused to shake the hands of the clients. Afterword, DeMello asked the senior broker why he had not shaken hands with them. The broker stated that "it's an AIDS thing."

53.     DeMello was criticized repeatedly by Greener for hiring Welch for the Copley Square PUB branch on the racial grounds as set forth above. DeMello complained to her that he objected to and would not accede to any such race-based branch reassignments.

54.     DeMello was present at the nine-box meetings referenced above, and was shocked to hear of Greener and Ferraro's race-based reasons for wanting to reassign Welch. DeMello complained to Greener and Ferraro that it was plainly illegal and unethical to move employees on the basis of their race or ethnicity. He said: "Is this legal? Aren't we profiling these people? Who do we think this is going to help?" In response, Greener said to DeMello, in the presence of Ferraro: "What happens in this room stays in this room."

55.     In addition, Greener would routinely make fun of other minority PUB employees in front of DeMello. Greener said about Dembele, an African-American PUB manager, that he "can't speak English," has an unintelligible accent, and must have large genitalia.

56.     DeMello complained to a PUB executive about these incidents as well as the general toxic workplace environment at PUB, and insisted that diversity and inclusion training was necessary. This executive brought DeMello's concerns to the attention of PUB's senior-level Human Resources representatives. However, no such training was done and the atmosphere did not change.

57.     Greener learned that DeMello had complained about her pervasively discriminatory conduct. As a result, Greener began to retaliate against DeMello. Greener started to make it more difficult for DeMello to get business loan deals closed by imposing, on an ad

hoc basis, more stringent underwriting requirements for DeMello's loan packages, just as Greener had done to Welch. Greener directly or indirectly prevented DeMello from contracting with potentially profitable PUB clients. This hurt DeMello financially, who was compensated in part by his loan production numbers, as addressed above.

58.     Greener told DeMello that she heard that he had "gotten AIDS", and that as a result he was not likely to be able to fulfill his job duties. Greener told DeMello that she was planning on reclassifying him as a "self-contributor", which is a demotion from his position as vice president. DeMello protested and made clear that he had met or exceeded all of his performance guidelines and benchmarks, and that her conduct was retaliatory.

59.     PUB had recruited DeMello away from other gainful employment with false assurances and representations that PUB would provide him a banking platform from which he would be able to service his clients and grow his book of business. However, these statements by PUB were false and misleading, and it breached its obligations to DeMello as a result of the conduct of Greener and the complicity of PUB management as set forth above.

60.     Ultimately, DeMello resigned from PUB in July, 2017, as he was unable to properly perform his job and close loans and thus was being denied fair compensation.

61.     He now works for another bank and has taken a reduction in pay. PUB deprived DeMello of advantageous business opportunities and his career and financial opportunities have been damaged thereby.

### C.    **Mamadou Dembele**

62.     The facts set forth above which relate to Dembele are incorporated herein by reference.

63.     Dembele, who is African-American, was born in Senegal, West Africa and is a

US citizen.

64.    Dembele has worked in the banking industry for many years as a senior level financial professional.

65.    On or about January 2, 2017, Dembele was recruited to work at PUB as a market manager and earned $130,000 per year plus bonuses.

66.    Prior to joining PUB, Dembele worked at Eastern Bank and had achieved "Pinnacle" status, which is a designation reserved for the most successful employees. While at Eastern Bank, Greener was his supervisor.

67.    Working under Greener was so unpleasant that Dembele complained to the president of Eastern Bank, Robert Rivers, and requested that he be moved out of her region. That request was granted.

68.    Upon information and belief, Greener has been the subject of discrimination claims and/or lawsuits while working for several employers, including Eastern Bank and/or Citizen's Bank, and later PUB.

69.    After joining PUB, Dembele was assigned to the Merrimack Valley market, which was distressed, and he improved it. Dembele worked diligently to make the Merrimack Valley market an improved PUB territory during his first year with the company.

70.    Several months later, Greener too was recruited by PUB, and was assigned to be Dembele's manager.

71.    While at PUB, Greener was named in a discrimination lawsuit, and records from an investigation into her discriminatory conduct while at Eastern Bank were subpoenaed. Greener read those records, and learned that he had given testimony against her in that investigation. Greener told Dembele that she knew that he had rendered testimony, and that this

would not be good for his career under her at PUB.

72.     Greener had discretion in awarding bonuses and incentives. In order to discriminate and retaliate against Dembele, she refused to give him discretionary bonuses and incentives despite giving such monies to lesser-performing Caucasian managers.

73.     Greener was instrumental in having Dembele transferred among PUB branches, which Dembele did not want. In addition to his frequent relocations, Dembele was denied pay that he had been promised. Dembele also discovered that he was being denied benefits and discretionary pay that were provided to lesser-performing Caucasian colleagues.

74.     In performance evaluations, Greener was very positive about Dembele's workplace achievements on behalf of PUB. However, on a day-to-day basis Greener would make racist, demeaning, unprofessional and plainly derisive comments to and/or about Dembele, including without limitation:

    a.     Black employees should not be in white-dominant PUB locations;

    b.     She does not "take orders from Negroes" like him;

    c.     Black men generally have larger private parts than white men;

    d.     He has large private parts;

    e.     His wife must have large private parts;

    f.     He has a big head;

    g.     His accent is too thick;

    h.     He does not speak English;

    i.     He is dumb;

    j.     He is poor; and

    k.     Greener would swear at Dembele in Italian and make obscene hand

gestures to him.

75.     Dembele was present at the nine-box meetings, addressed above, in which

Greener stated that Welch needed to be moved from Copley because that area is "white

dominant" and she did not belong there.

76.     Greener also told Dembele that PUB management wanted to move Mori, an

African-American assistant manager at PUB, from the North Andover branch to the Lowell

branch. When Dembele asked Greener why, Greener said that: "Mori would be a better 'fit' there

because Lowell has more immigrants, Kenyans and Tanzanians". Dembele informed Greener

that this was discriminatory and that she should not do this, but Greener did it anyway. Greener

moved Mori solely on race-based grounds against his wishes.

77.     At another nine-box meeting at which Greener, Ferraro and another Human

Resources manager named Edward Nicoletti ("Nicoletti") were present, a certain African-

American Manager, Mr. "D", was put up for discussion. Scott Dinack, a Caucasian regional

market manager, stated that he looked like a "Jamal or Tyrone" and would not be good for a

white-dominant market. Greener then said, "well, what would we say about Mamadou, then?"

Ferraro and Nicoletti participated in this joking conversation. Dembele complained that this was

unacceptable and discriminatory and that PUB should not be making Human Resources and

reassignment decisions on the basis of race, however his objections were overruled and the race-

based reassignment was made.

78.     Dembele was frequently moved to manage different territories throughout his

tenure. Every time Dembele managed to successfully turn a market around, PUB management

would move his work to another economically distressed territory and then give the territory

Dembele rehabilitated to a Caucasian colleague. These reassignments left Dembele in the

unenviable position of having to constantly restart his business, learn a new market and develop new business contacts.

79.    Dembele repeatedly complained to the Human Resources department, including to Ferraro and Nicoletti, however none of the foregoing problems were rectified.

80.    Dembele was aware that there was a hotline for employees to report incidents of harassment and discrimination which was intended to be confidential. However, it was a pattern and practice of the Human Resources department to reveal the identity of the complaining party to the complained-of party, and therefore he did not want to use it.

81.    Greener informed Dembele that she was "very well connected in the banking industry" and would "make life difficult" for anyone who complained about her.

82.    Greener informed Dembele that if anyone "messed with" her job by complaining about her, she had close connections with the mafia and would have them "pay a visit" to the complainant. She said that she could have anyone killed whom she wanted. She also said that Ferraro and Nicoletti were her "Italian boys" and that they would "have her back" on any employment disputes. She said she could do whatever she wanted to her branch managers and could reassign them at will because senior PUB management was "stupid" and would do whatever she wanted.

83.    Greener told Associate Market Manager, Michael Zaldumbide ("Zaldumbide"), that she felt "Mamadou knows too much" about PUB management's wrongful and discriminatory practices and procedures and that: "I hope he will never hire an attorney because he knows too much."

84.    There is a long trail of friendly and positive text messages between Dembele and Greener, but this does not negate the racism that Greener visited upon Dembele and others and

its acceptance by senior PUB management. Greener was virulently racist in person but did not

express that racism over texts and e-mails. Dembele endured the pervasive discrimination, racial

belittling and abuse by Greener because his job was at stake and he needed the job to support his

wife and children and to pay his mortgage.

85.     Greener said in front of Michael Don ("Don"), an Asian-American PUB

employee, that she was very powerful in the Boston banking community and could prevent

Dembele or anyone else from getting another job at another bank if she wanted to. Greener

would tell racially offensive Asian-based jokes directly to Don's face. When he asked her to stop

doing that, she refused.

86.     Dembele suffered panic attacks as a result of the hostile work environment and

the failure of management to rectify the discriminatory practices.

87.     Eventually, after two and a half years of enduring daily abuse, Dembele was

forced to leave PUB in July, 2019, as a result of the hostile work environment and the failure of

management to rectify the discriminatory practices.

88.     Upon Dembele's departure Greener instructed a PUB subordinate to follow

Dembele on Linked-In to see where he was working. That employee told Dembele that Greener

said she was going to "teach Dembele a lesson".

89.     Upon departure, Dembele wrote a favorable and upbeat "farewell" e-mail to

Greener. Akin to the text messages set forth above, Dembele did this because he believed

Greener's threats of retaliation. Dembele was aware of other instances where Greener took active

steps to sabotage the careers of other former managers who had left and complained about her.

90.     On or about October 10, 2019, Dembele initiated an action before the MCAD,

alleging violations of G.L. c. 151B, § 4, and Title VII of the Civil Rights Act of 1964. See

MCAD Docket No.: 19BEM03348. On or about June 3, 2020, Dembele removed his action from MCAD pursuant to 804 CMR 1.15(2). On or about June 4, 2020, Dembele removed his action from the EEOC and now brings this action.

**D.    Souleymane Mori**

91.    Mori, who is African-American, was born in Niger and is a US citizen.

92.    Mori had polio as a child and is disabled and cannot walk without the aid of two crutches.

93.    Mori has worked in the banking industry for many years in a management capacity and has a Master in Business Administration degree from Rutgers University.

94.    In or about February of 2017, Mori was recruited to work at PUB as a sales and service supervisor and assistant manager.

95.    Upon starting his position at PUB's North Andover branch, Mori's manager, Brian Firt ("Firt"), began expressing annoyance with Mori because he could not walk fast as a result of his disability. He told Mori: "You're too slow. You can do this faster."

96.    When Mori would bring a cash drawer to the bank's vault, which took Mori more time to do on account of his disability, Firt would mock Mori and would affect an exaggerated limp in mimicking how Mori walked.

97.    Firt stated that Mori was "not up for the job" because of his disability. This, however, was not true. Mori was able to perform all of the necessary tasks of a bank manager.

98.    Dembele became aware of Firt's discriminatory behavior towards Mori and reported it to PUB management, but management failed to correct Firt or provide him with disability sensitivity training.

99.    When Mori started with PUB he was assigned as an assistant manager of the PUB

branch in North Andover.

100.    However, Greener told Dembele that PUB management wanted to move Mori to the Lowell branch because Mori would be "a better 'fit' in Lowell because Lowell has more immigrants, Kenyans and Tanzanians", as set forth above. Dembele informed Greener that this was discriminatory and that she should not do this, but Greener did anyway. She said that senior PUB management would go along with her reassignment recommendations.

101.    Thus, Mori was transferred to PUB's Lowell branch against his wishes. This deprived him of the opportunity to close more lucrative loans. He would have made more money if he had been permitted to stay in the North Andover branch. This was the same problem experienced by Welch and Dembele as set forth above.

102.    Mori made his ambitions clear to PUB management that he wanted to make a career at PUB and that he wanted to move into more senior management positions.

103.    Mori enrolled in PUB's leadership training program. In or about the fall of 2018, Mori successfully completed the program and was told by Melissa Holbrooke ("Holbrooke"), market manager, that he should apply to future management positions that became available.

104.    In or about November of 2018, a branch manager position opened in Springfield, Massachusetts. Mori applied for the job but was passed over in favor of a less qualified Caucasian employee.

105.    Mori complained to PUB's Human Resources department as he believed the reason he was not being considered for the position was discriminatory.

106.    Prior to submitting his complaint, Mori was deemed an excellent employee with positive performance evaluations and a history of opening more new accounts than average. Yet, after submitting his complaint, PUB management deemed Mori to be a poor employee and began

seeking to manage him out of the company. Within several weeks of submitting his complaint:

    i.      Mori was placed on a performance coaching plan;

    ii.     On or about November 28, 2019, Mori was accused of sending a loan document to the underwriting department which contained a customer's confidential financial information and which was sent without the customer's approval in violation of company's rules. However, Mori had not done this;

    iii.    PUB management started to discipline Mori for actions that other colleagues were not being disciplined for, such as requesting time off to attend to family events; and

    iv.    PUB management began ostracizing Mori and would not invite him to meetings of which he had previously been a part.

107. During this time, Mori, knowing that he was being retaliated against, requested a transfer to a new branch location. The transfer was not granted.

108. Mori was forced to leave PUB in May of 2019. He lost his 401k plan at PUB and the ability to more quickly rise in his banking career.

109. Mori was an excellent employee with a promising career at PUB, and was dependent on that job to support his family. PUB management cut Mori's career short, however, when they discriminated and retaliated against him.

110. On or about October 22, 2019, Mori initiated an action before the MCAD, alleging violations of G.L. c. 151B, § 4, and Title VII of the Civil Rights Act of 1964. See MCAD Docket No.: 19BEM03417. On or about May 7, 2020, Mori removed his action from MCAD pursuant to 804 CMR 1.15(2). On or about June 4, 2020, Mori removed his action from

the EEOC and now brings this action.

      **E.**      **Dolunay Moser**

111.    Moser is a 46-year-old woman with many years of experience in the banking industry. Prior to working at PUB, Moser worked for Citizen's Bank ("Citizen's") as a senior vice president where she managed 180 people over 16 branch locations.

112.    Moser was recruited by PUB. Initially, Moser enjoyed a good working environment at PUB.

113.    Greener then became the supervisor of Moser's branch. Moser and nearly all of her colleagues were wary because they knew Greener had a history of discrimination and unsuccessful tenures at other banks. It was widely known that Greener had been the subject of prior complaints of harassment and discrimination.

114.    From the inception of Greener's arrival at PUB, Greener would constantly demean Moser, belittle her, comment on her looks, comment on her body shape, and degrade her in front of her coworkers. All of Greener's comments were focused on Moser's gender.

115.    Greener and Associate Market Manager, Zaldumbide, told Moser that if she had been a man she would have been more successful in the banking industry. Zaldumbide told Moser: "You're 46, right? Banking only goes so far with a woman your age. You should consider real estate." He further demeaned Moser by stating that a middle-aged woman had no future in the banking industry, and encouraged her to seek out a more "feminine" career.

116.    Greener and Zaldumbide also sexually harassed other PUB employees, including Moser's direct reports. Zaldumbide told Moser's female associate that her looks would help her "go far in the banking industry," and that she should "work closer to the front of the bank where customers could get a better look" at her.

117.    The atmosphere was so tense that Moser's colleagues told her that they were uncomfortable coming to work, and they would vigilantly watch which cars pulled into the parking lot, hoping that they were not Greener's or Zaldumbide's.

118.    Moser complained to Human Resources repeatedly about this gender-based harassment. A Human Resources representative asked Moser to meet him at a Panera Bread location at the Liberty Tree Mall to discuss. He said to her: "Dolly, thank you, this is bold and important. Rest assured that you are not the only one I am discussing Anna with. Senior management is very well aware of what is going on. We are taking your allegations seriously."

119.    Moser welcomed an investigation and offered to provide PUB management with any assistance necessary, because she did not want to work in a toxic environment and also felt an obligation to her coworkers.

120.    However, despite these assurances, and the full knowledge of senior PUB management, nothing was ever done to rectify the toxic work environment.

121.    Moser's colleagues also complained to Human Resources, but no corrections were made. One of her colleagues left his job at PUB, stating that he feared the harassment would only get worse.

122.    In response to Moser's complaints, Greener told Zaldumbide that he needed to get Moser to quit her job. Accordingly, Zaldumbide stepped up his harassment and retaliation of Moser but failed to force her resignation. Greener told Zaldumbide that he was "incompetent and incapable" and that she "just asked [him] to execute one task and get rid of Dolly." Greener then stated, "watch me: I will do this in the blink of an eye." Upon information and belief, after making this comment, Greener took over management of Moser's Performance Coaching Plan.

123.    Eventually, the harassment got so bad that Moser did not want to go to work, she

did not want to go home, and she did not want to be with her family. She could not eat well and lost an unhealthy amount of weight. She was stressed every day and had nightmares. She spent an inordinate amount of time calming down her colleagues at work. As a result of the discrimination and retaliation at PUB, Moser suffered severe anxiety, stress, and sleep deprivation and her career suffered.

124.    In or about November, 2018, Moser quit her employment at PUB and moved to Bank of America.

125.    Despite her constructive termination, PUB management told Moser they would continue to investigate her claims of discrimination and harassment and would allow her to participate in those investigations. However, to Moser's knowledge, no investigation was ever conducted as she was never contacted by PUB management.

126.    Upon information and belief, after Moser left PUB, a negative review was placed in her employment file. Moser never saw that review until the inception of this litigation. Upon review, Moser realized that her signature had been forged on that negative review.

127.    The inclusion of this negative review in Moser's personnel file was designed to retaliate against Moser and to harm her future employment opportunities.

128.    On or about September 27, 2019, Moser initiated an action before the MCAD alleging violations of G.L. c. 151B, § 4, and Title VII of the Civil Rights Act of 1964. See MCAD Docket No.: 19BEM03015. On or about May 7, 2020, Moser removed her action from MCAD pursuant to 804 CMR 1.15(2). On or about June 4, 2020, Moser removed her action from the EEOC and now brings this action.

   **F.    <u>Minerva Elsayed</u>**

129.    Elsayed is a practicing Muslim of Egyptian descent.

130.    Since 2000, Elsayed has had a successful career in the banking industry. Prior to joining PUB, Elsayed was a vice president at Citizen's where she ran 13 branches and had 13 branch managers reporting to her. She then moved to Bank of America where she was a vice president overseeing 43 banking centers.

131.    Elsayed began working for PUB in September, 2013, as a manager at PUB's Malden branch. She received consistent recognition as a hardworking and effective manager.

132.    In or about March of 2017, Elsayed began reporting to Greener. When this happened, the work environment at PUB became toxic.

133.    Upon discovering that Elsayed was Muslim and that her family had once lived in Egypt, Greener began to subject Elsayed to constant attacks, insults and mocking on the basis of Elsayed's religion and national origin.

134.    Greener began disparaging Egypt and the Middle East to Elsayed. Greener told Elsayed that she hoped she was not a terrorist. Greener mocked Elsayed by saying that Elsayed probably did not have running water while in Egypt. Greener told Elsayed that she pitied her. Greener mocked Elsayed saying that it must be difficult to be subject to the rules and laws imposed by her husband, and then asked what those rules were. Greener mocked Elsayed's observance of Ramadan, calling it "horrible." Greener would also mock Elsayed's Muslim culture and religion by asking why she does not cover her hair like she must have done in Egypt.

135.    Greener harassed Elsayed's direct reports, including Claudio Rodriguez, to whom she directly disparaged his Hispanic heritage.

136.    Elsayed repeatedly asked Greener to stop this harassment, but Greener did not stop.

137.    Elsayed complained to PUB management about Greener and the overall toxic and

23

discriminatory workplace at PUB.

138.    Wildman informed Elsayed that there was nothing that could be done, and that Elsayed "needed to watch [her] back" due to Greener's animus toward her and to people of color in general. Wildman informed Elsayed that he too had complained about Greener due to her incessant mocking of him due to being gay, but PUB management refused to take any remedial actions, so there was nothing she could do.

139.    Prior to making her complaint, Elsayed was deemed an excellent employee, but after her complaint, Greener began manufacturing reasons to criticize Elsayed's performance and to cause her to want to leave PUB.

140.    Elsayed continued to try and perform her job duties under the increased stress of retaliation, but it became impossible. Elsayed stopped working at PUB. Rodriguez and another of Elsayed's direct reports also left PUB at the same time, and informed Elsayed that without her there to protect them from Greener they no longer wanted to be employed by PUB.

141.    As a result of PUB's discrimination and retaliation, Elsayed sought psychiatric treatment and was prescribed anti-depressant medication to deal with the stress and anxiety. She has been unable to procure gainful employment since her wrongful termination.

142.    On or about September 14, 2018, Elsayed initiated an action before the MCAD alleging violations of G.L. c. 151B, § 4, and Title VII of the Civil Rights Act of 1964. See MCAD Docket No.: 19BEM02560. On or about May 7, 2020, Elsayed removed her action from MCAD pursuant to 804 CMR 1.15(2). On or about June 4, 2020, Elsayed removed her action from the EEOC and now brings this action.

143.    PUB management had both actual and constructive knowledge of the discriminatory and retaliatory actions described above but failed to take any meaningful steps to

make the work environment better for the plaintiffs or similarly situated minority employees, as was their legal duty.

144.    The Human Resources department of PUB also had actual and constructive knowledge of the discriminatory and retaliatory actions described above but failed to take any meaningful steps to make the work environment better for the plaintiffs or similarly situated minority employees, as was its legal duty.

**COUNT I**
**DISCRIMINATION AND RETALIATION IN VIOLATION OF TITLE VII**
**OF THE CIVIL RIGHTS ACT OF 1964 AND M.G.L. C. 151B**
**WELCH, DEMELLO, DEMBELE, MORI, MOSER AND ELSAYED AGAINST PUB**

145.    All allegations set forth above are restated and realleged as if set forth in full herein.

146.    As set forth above, Welch, Dembele and Mori are members of a protected class with respect to, *inter alia*, their race.

147.    As set forth above, DeMello is a member of a protected class with respect to, *inter alia*, his sexual orientation. DeMello did not file a charge of discrimination with the EEOC before filing this case because sexual orientation discrimination had not previously been covered by Title VII of the Civil Rights Act of 1964. However, in light of the Supreme Court's recent decision on June 15, 2020 in Bostock v. Clayton County, 590 U. S. ____ (2020), DeMello now has a cause of action for sexual orientation discrimination under Title VII of the Civil Rights Act of 1964. Further, the non-filing of an EEOC claim is not a jurisdictional bar to DeMello's claim.

148.    As set forth above, Moser is a member of a protected class with respect to, *inter alia*, her gender.

149.    As set forth above, Elsayed is a member of a protected class with respect to, *inter alia*, her national origin and religion.

25

150.     As set forth above, the conduct of PUB constitutes unlawful discrimination based on Welch, DeMello, Dembele, Mori, Moser and Elsayed's protected statuses and violates Title VII of the Civil Rights Act of 1964 and M.G.L. c. 151B.

151.     The work environment at PUB was hostile and/or abusive for Welch, DeMello, Dembele, Mori, Moser and Elsayed as a result of the discriminatory actions directed against them as set forth above.

152.     Welch, DeMello, Dembele, Mori, Moser and Elsayed suffered adverse tangible employment actions as a result of PUB's hostile work environment.

153.     PUB management knew or should have known of the abusive conduct directed against Welch, DeMello, Dembele, Mori, Moser and Elsayed but failed to rectify it.

154.     In addition, the conduct of PUB was so severe and pervasive that a reasonable person in Welch, DeMello, Dembele, Mori, Moser and Elsayed's positions would similarly find PUB's work environment to be hostile and/or abusive.

155.     The outrageous conduct of PUB described in detail above was done with malice and oppression and with conscious disregard for Welch, DeMello, Dembele, Mori, Moser and Elsayed's rights and with the intent, design and purpose of injuring them. PUB, through its officers, managing agents and/or its supervisors, authorized, condoned and/or ratified the unlawful conduct directed towards Welch, Dembele, DeMello, Mori, Moser and Elsayed.

156.     By virtue of the conduct alleged above, PUB participated in a pattern and practice of violating Welch, Dembele, Mori, Moser, DeMello and Elsayed's Civil Rights through acts of discrimination.

157.     Furthermore, PUB retaliated against Welch, DeMello, Dembele, Mori, Moser and Elsayed after they engaged in activities protected by Title VII of the Civil Rights Act of 1964

and M.G.L. c. 151B and there was a direct causal connection between Welch, Dembele, Mori, Moser, DeMello and Elsayed's protected activities and PUB's retaliation.

158.     As a direct and proximate result of PUB's actions and inactions, including its willful, knowing and intentional discrimination and retaliation, Welch, DeMello, Dembele, Mori, Moser and Elsayed suffered and continue to suffer damages including but not limited to lost wages, lost promotional opportunities, lost commissions and other benefits.

159.     As a further direct and proximate result of PUB's conduct, Welch, DeMello, Dembele, Mori, Moser and Elsayed have also suffered and continue to suffer emotional and mental distress with objective symptomology, anguish, embarrassment, humiliation and reputational damages.

160.     As a result of PUB's unlawful discrimination and retaliation, Welch, DeMello, Dembele, Mori, Moser and Elsayed seek any and all compensation and damages as may be available under law including punitive or exemplary damages, attorneys' fees and costs.

<u>COUNT II</u>
<u>DISCRIMINATION BASED ON RACE IN VIOLATION OF SECTION 1981 OF THE</u>
<u>CIVIL RIGHTS ACT OF 1866, 42 U.S.C. § 1981 *ET SEQ.* AND M.G.L. C. 151B</u>
<u>WELCH, DEMBELE AND MORI AGAINST PUB</u>

161.     All allegations set forth above are restated and realleged as if set forth in full herein.

162.     The conduct set forth above violates Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 *et seq.* as PUB engaged in the practice of discrimination on the basis of race and/or color with respect to Welch, Dembele and Mori's terms and conditions of employment.

163.     PUB intentionally discriminated against Welch, Dembele and Mori and maintained a policy that discriminated against African-American bankers by denying them assignments and promotions to more favorable, wealthier branch office locations, subjecting

them to fewer promotions, higher standards, and lower compensation than their non-African-American counterparts.

164.    PUB's discriminatory conduct was so severe or pervasive that a reasonable person in Welch, Dembele and Mori's position would find PUB's work environment to be hostile or abusive. Welch, Dembele and Mori found PUB's work environment to be hostile or abusive.

165.    By virtue of the conduct set forth above, PUB participated in a pattern and practice of violating Welch, Dembele and Mori's Civil Rights through acts of discrimination.

166.    In addition, PUB retaliated against Welch, Dembele and Mori because they engaged in activities protected by Section 1981 of the Civil Rights Act of 1866 and M.G.L. c. 151B.

167.    Welch, Dembele and Mori suffered adverse tangible employment actions as a result of PUB's hostile work environment and their complaints regarding the same, and there was a direct causal connection between PUB's retaliation and Welch, Dembele and Mori's protected activities.

168.    As a result of PUB's unlawful discrimination and retaliation in violation of Section 1981 of the Civil Rights Act of 1866 and M.G.L. c. 151B, Welch, Dembele and Mori have suffered substantial damages as hereinbefore alleged.

## COUNT III
## VIOLATION OF THE AGE DISCRIMINATION IN EMPLOYMENT ACT, 29 U.S.C. § 623(A) AND M.G.L. C. 151B
## MOSER AGAINST PUB

169.    All allegations set forth above are restated and realleged as if set forth in full herein.

170.    The ADEA applies to employers with 20 or more employees and protects employees and applicants who are 40 years of age or over from discrimination in the workplace because of their age.

171.    Moser was subjected to harassment by PUB management and that harassment was motivated by Moser's age. This conduct was not welcomed by Moser.

172.    This conduct was motivated by the fact that Moser is over 40.

173.    The conduct was so severe or pervasive that a reasonable person in Moser's position would find PUB's work environment to be hostile or abusive.

174.    Moser believed her work environment to be hostile or abusive.

175.    Moser suffered an adverse tangible employment action as a result of the hostile work environment.

176.    As a result of PUB'S actions, Moser has suffered substantial damages as hereinbefore alleged.

**COUNT IV**
**WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY**
**DEMELLO AGAINST PUB**

177.    All allegations set forth above are restated and realleged as if set forth in full herein.

178.    In the alternative to the statutory claim set forth above, and pursuant to Fed. R. Civ. P. 8(a)(3), DeMello hereby alleges that PUB terminated him in violation of public policy.

179.    As set forth above, DeMello repeatedly and overtly objected to PUB's systemic discrimination against minority employees in violation of federal law, and he did so directly to PUB management.

180.    DeMello's employment was constructively terminated in violation of public policy. Senior PUB management intentionally interfered with DeMello's ability to close deals in direct retaliation for DeMello's complaints about PUB's violations of Federal law, particularly PUB's violations of the Civil Rights of other managers including race-based discriminatory manager reassignments and anti-gay discrimination. Redress for termination in violation of public policy is available to employees who, like DeMello, are terminated for asserting a legally guaranteed right, for doing what the law requires, and for refusing to do what the law forbids. Here DeMello "plainly placed himself within the purview of the public policy doctrine's protections" as he refused to accede to a violation of law, and instead did what the law requires. Saulsberry v. St. Mary's Univ., 318 F.3d 862 (8th Cir. 2003).

181.    DeMello's employment agreement with PUB was that he was compensated in direct relation to the volume and amount of loan deals he brought to the bank.

182.    The denial by PUB management of the loan packages submitted by DeMello, and the denial of income to DeMello as a direct and intended result thereof, were without factual or lawful basis, and therefore in material breach of the covenant implied in DeMello's employment that he be permitted to present sound business loans and to be compensated as a result thereof. The denial of the loans was pretextual and was in fact on the basis of DeMello's refusal to acquiesce to Civil Rights violations by PUB.

183.    Accordingly, DeMello was constructively terminated, and this termination was wrongful and in violation of public policy. A causal relationship exists between DeMello's protected activity and the adverse actions taken against him by PUB management.

184.    As a result of PUB's actions, DeMello has suffered substantial damages as hereinbefore alleged.

## PRAYERS FOR RELIEF

WHEREFORE Plaintiffs respectfully request that this Honorable Court:

1.      Enter judgment against PUB in such amount as the Court deems proper and just;

2.      Award the plaintiffs damages and lost wages in an amount according to proof at trial;

3.      Award the plaintiffs reasonable attorney's fees, costs and interest allowable by law;

4.      Award plaintiffs punitive damages according to proof; and

5.      Grant such further relief as may be equitable and just.

## DEMAND FOR JURY TRIAL

Plaintiffs respectfully demand a trial by jury on all counts and all issues so triable.

Respectfully submitted,

RENEE WELCH, JASON DEMELLO,
MAMADOU DEMBELE, SOULEYMANE
MORI, DOLUNAY MOSER and
MINERVA ELSAYED

Plaintiffs

By their attorney,


/s/ Travis T. Pregent
Travis T. Pregent, Esq. (BBO #682998)
PREGENT LAW
One State Street, Suite 1200
Boston, MA 02109
(978) 381-3256
travis@pregentlaw.com

Date: July 24, 2020

<u>CERTIFICATION</u>

I certify that I have served this document via Notice of Electronic Filing for parties and counsel on the date set forth below in accordance with the Federal Rules of Civil Procedure and this Court's Local Rules.

/s/ Travis T. Pregent _____
Travis T. Pregent

Date:  July 24, 2020